UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| OUTFRONT MEDIA, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TERRI LEMASTER, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| -------------- | ) | |
| | ) | |
| TERRI LEMASTER, and | ) | |
| PERFORMANCE MEDIA, LLC, | ) | |
| | ) | |
| Counterclaim and Third-Party | ) | |
| Plaintiffs, | ) | 7:17-CV-66-REW-EBA |
| | ) | |
| v. | ) | |
| | ) | **OPINION & ORDER** |
| OUTFRONT MEDIA, LLC, *et al*., | ) | |
| | ) | |
| | ) | |
| Counterclaim Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RANDALL POWELL, and | ) | |
| BRENDA POWELL, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*** *** *** ***

Outfront Media, LLC and Terri LeMaster[1] filed cross motions for summary judgment. DE 100 (Plaintiff's Motion); 101 (Defendant's Motion). Each responded. DE 120 (Plaintiff's Response); 121 (Defendant's Response). Each replied. DE 123 (Plaintiff's Reply); 126 (Defendant's Reply). For the following reasons and under the applicable standards, the Court **GRANTS IN PART** Plaintiff's motion, DE 100, and **GRANTS IN PART** Defendant's motion, DE 101.

This case, involving a dispute about control of five billboards in Rockcastle County, is more one of title than tort. The record establishes that, in 2016, Outfront had five abated but valid leases that impressed the Powell land. LeMaster, ignorant of the leases, purported to buy the billboards from the Powells, with the plan to remove the static billboards and accrue credit toward a permit for an electronic billboard under a Kentucky highway billboard regulatory scheme. She took concrete steps to effectuate the plan, felling the billboards and seeking state credit. Outfront, itself seeking the credits, discovered those steps, resulting in this litigation.

The Court, after full consideration of the record, finds Outfront the proper billboard owner (and thus, entitled to the electronic credits). LeMaster converted the billboards, and Outfront is entitled to a remedy, some of which the Court gives and some it reserves for a jury. The Court rejects the tortious interference claim. Obviously, LeMaster's inverse claim to relief, depending on a prevalent claim to the billboards, fails.

---

[1] The Court refers to Terri LeMaster and her company, Performance Media, LLC collectively as "LeMaster."

# I.        BACKGROUND

LeMaster and Outfront each want to build an electronic billboard. As relevant here, to secure the required permitting, the Kentucky Transportation Cabinet ("KYTC")—the Commonwealth's billboard regulator—requires applicants to remove existing static billboards. Specifically, an administrative rule requires that a party remove six qualifying static billboards in exchange for a permit to erect one electronic billboard. 603 KAR 10:021 § 2(1); KRS 177.890 (requiring KYTC to promulgate administrative regulations to comply with the Highway Beautification Act under 32 U.S.C § 131). The parties do not dispute that the (already-removed) billboards at issue here qualify for the permit exchange. Indeed, KYTC already determined that it will award four credits, toward the required six, for the billboards' removal. *See* DE 100-18. However, the parties dispute whether those credits should go to LeMaster or Outfront. The answer turns on who owned the billboards when they were removed.

In July 2016, LeMaster reached out to KYTC to determine whether removing the at-issue billboards would qualify for credits. DE 101-7 (KYTC Emails). KYTC advised that it could not discuss the billboards in detail without permission from the billboard owner. *Id*. at 12 (7/20/2016 Email). LeMaster submitted a permission letter and transfer of ownership forms, purporting to shift billboard title from the Powells to LeMaster, and KYTC subsequently indicated that it would grant credits[2] upon billboard removal. *See* DE 100-18 (7/22/2016 Letter). Several months later, Outfront contacted KYTC for like purposes, but Outfront discovered that the billboards had already been removed. *See* DE 100-13 (Watkins Depo.). Outfront initiated this suit after LeMaster refused to surrender the state credits. DE 1 (Compl.). KYTC is a party for purposes of credit disposition.

---

[2] Ownership of five billboards is at issue, although KYTC awarded credit for only four billboards.

Decades ago, Outfront's predecessors[3] erected billboards in Rockcastle County, Kentucky pursuant to leases with landowner Blanche Powell. DE 100-2 (1969 Lease & 1972 Lease). These initial leases were recorded with the Rockcastle County Clerk. *Id.* Years later, in 1983, Outfront and Blanche entered new leases, executing an independent lease for each of the five billboards. DE 100-3 (1983 Leases). Outfront recorded each 1983 lease with the Rockcastle County Clerk. *Id.* In 1998, Outfront "renegotiated three of the five 1983 Leases, leaving two of the 1983 leases in place 'as is.'" DE 100 at 2; DE 120-1 ¶ 7. The 1998 leases were not recorded. DE 100-5 at 5-10; DE 100-4 (1998 Leases). Outfront explains this progression and renegotiation of each lease. DE 100 at 2-3; DE 100-13 & 120-1. LeMaster questions whether Outfront is a party to the leases and whether the leases were still enforceable in 2016, not the historical fact of the leases. Outfront does not explain why only three of the leases were renegotiated and does not attempt to establish which specific lease governed which specific billboard. However, such precise cataloging is unnecessary absent protest from LeMaster that the "leases in effect in 2016," DE 100-5, are not the apt paperwork for the four billboards supporting the KYTC awarded credits. In the Court's view, LeMaster tried to purchase rights to all 5 billboards, and the leases (from 1983 on two and

---

[3] LeMaster apparently considers whether Outfront is the successor-in-interest of the original signatory—and, thus, a party—to these leases to be a disputed fact. DE 101 at 2-3; DE 121 at 2-3. However, she does not sufficiently dispute the fact. Her statement of opposition, without record support and in light of clear succession evidence, does not work to defeat summary judgment. "It is not enough for a party to 'mention a possible argument in the most skeletal way' and leave the court to 'put flesh on its bones.'" *Brenay v. Schartow*, 709 F. App'x 331, 336–37 (6th Cir. 2017) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293 (1st Cir. 1995)). Outfront provided company information on file with the Delaware Secretary of State as well as an affidavit from the Outfront employee who negotiated the leases and is still with the company and long managed the at-issue billboards. DE 120-1. LeMaster points to no proof a reasonable decider could rely on to reject Outfront's status as successor. Accordingly, finding no triable issue on Outfront's claimed status, the Court refers to the predecessors collectively as Outfront.

1998 on three) blanket those billboards. KYTC withheld credit on one, but LeMaster purported to buy them all, and she removed them all. Thus, all five lease documents pertain in the case.

In 2010, Blanche Powell died, and title to her farm, as well as the billboard lease obligations, passed to her son and daughter, Randall and Brenda Powell. DE 100-12 (Brenda Powell Depo.). The Powells took via Blanche Powell's will, which went through probate. Another sibling was the Executrix. DE 100-12 at 22. No one contests that the leases attached to the land and remained in effect against the Powell heirs. Well before 2010, however, Outfront started withholding payments under the rent abatement provisions of the leases, citing obstruction from vegetation overgrowth and failure to secure an advertiser. DE 100-6, 7, 8, 10 & 11 (Letters to Blanche Powell). From June 2002 on, Outfront abated payments on all five billboards. LeMaster scrutinizes Outfront's conduct during this time for evidence that Outfront no longer owned the billboards in 2016, when she removed them. Specifically, she contends the "billboard leases were subsequently abandoned due to prolonged abatement of rent payments, failure to maintain the signs causing dilapidation, failing to correspond with the lessors, and failing to permit the billboards." DE 101 at 5. Outfront responds with evidence of its conduct consistent with lease continuance. *See, e.g.*, DE 100-14 (Call Report).

The Powell heir-LeMaster transaction has some mystery and dispute to it, and the versions differ. The Powells knew there had been leases and that payments had been abated since 2002. *See* DE 100-12 at 22; DE 100-24 at 29. They denied knowing any leases remained in effect, and they had no contact with Outfront since taking the land as Blanche Powell's heirs. *See id*. LeMaster did no due diligence in the Rockcastle County Clerk's Office. She assumed the Powells would not sell without title, and she assumed KYTC (which had no ownership record as to the aged billboards) would flag the matter if a contrary owner emerged. She may or may not have actually paid the

Powells anything—the bill of sale references no consideration. LeMaster did take down the billboards. The disputed parts of the deal do not impact the Court's ruling.

After discovering the billboard removal, Outfront asked KYTC to delay issuing LeMaster the related credits. DE 100-19 (Open Records Request & E-Mail to KYTC). Outfront then sent LeMaster a demand for the credits, offering to forgo litigation if LeMaster would "transfer[] the electronic device credits associated with the billboards . . . from her name to Outfront," subject to KYTC approval. Suit followed.

## II.      STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*,

106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

Outfront seeks to recover under theories of conversion and tortious interference with contract. *See* DE 1 (Compl.) at 7-8. LeMaster counters with a separate tort theory regarding Outfront's assertion of its rights with the KYTC and in this case. Each party seeks summary

judgment defensively and offensively.[4] The Court issues the relief justified by the record under the Rule 56 rubric.

## III.    ANALYSIS

For Outfront to prevail, the leases must have remained in operation and LeMaster must not be entitled to bona fide purchaser protection. For LeMaster to prevail, the leases must have lapsed or otherwise been rendered unenforceable, the trade fixtures abandoned, and the Powell's transfer of ownership to LeMaster effectuated.[5] If the leases remained in place, the Powells had no right to sell and LeMaster no power to buy the billboards. Lease efficacy would mean LeMaster took Outfront's property—the billboards, destroyed, and resultant electronic credits—without right, thus that LeMaster converted the billboards.

### A.    Conversion

"Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014). Kentucky requires these elements:

(1) the plaintiff had legal title to the converted property;
(2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;

---

[4] The Court applies the same standard of review to cross-motions for summary judgment as when only one party files. *McKim v. New Market Techs., Inc.*, 370 F. App'x. 600, 603 (6th. Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). Summary judgment for one side is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (footnote omitted). Indeed, "'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting Wright, Miller & Kane, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

[5] LeMaster does not seek summary judgment on her unresolved negligence and breach of contract third-party claims against the Powells. DE 38 (Third-Party Compl.). The Court limits its analysis accordingly.

(3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;
(4) the defendant intended to interfere with the plaintiff's possession;
(5) the plaintiff made some demand for the property's return which the defendant refused;
(6) the defendant's act was the legal cause of the plaintiff's loss of the property; and
(7) the plaintiff suffered damage by the loss of the property.

*Jasper v. Blair*, 492 S.W.3d 579, 583 (Ky. Ct. App. 2016)*; Ky. Ass'n of Cntys. All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005). Per the Rule 56 standards, Outfront establishes the elements of its conversion claim as a matter of law.

      *i.*      *Legal Title to the Billboards and Possession Rights*

While Outfront's claim emerges as tortious conversion, it begins as a contract dispute. Outfront must demonstrate that it owned the billboards when LeMaster removed them to prevail on its conversion claim. Both Outfront and LeMaster have produced evidence purporting to show that each had legal title to the exclusion of the other. Outfront points to five leases it says were in effect and control the issue of ownership. DE 100-5. For her evidence, LeMaster offers a transfer of ownership form executed between Brenda Powell's heirs and LeMaster. DE 100-16 (Transfer Forms); 101-4 (Bill of Sale). For Outfront to have held legal title to the billboards when they were removed, the leases must control and render unenforceable the later purported transfer of ownership. For LeMaster to have held legal title to the billboards, the leases must have lapsed or ended, Outfront's subsequent failure to timely remove the billboards must have caused them to become abandoned trade fixtures (and thus Powell property), and the Powell-to-LeMaster transfer of ownership must be enforceable.

*Leases*

The Court first considers the leases. The five leases contain almost identical language, but divide into two versions: the 1983 Leases, DE 100-5 at 1-4, and the 1998 Leases, *id*. at 5-10. Both versions have terms regarding (1) automatic renewal; (2) termination; (3) assignability; (4) abatement; and, (5) trade fixtures. *See* DE 100-5. The two versions are materially like, except that the 1998 Leases were not registered with the Clerk, provided slightly more mutual termination rights, and included an additional provision addressing billboard abandonment.

Both versions provided for an initial ten-year term that, absent termination, could renew for another ten years, and then automatically renew on a year-to year-basis. *Id*. The 1983 Leases triggered that initial ten-year renewal "at the option of the Lessee," while the 1998 Leases triggered ten-year renewal automatically, absent advance written notice of termination by either party. *Id*. Both versions gave both Outfront and the Powells equal termination rights once the leases had entered the automatic yearly renewal phase, though the 1983 Leases required sixty-days' advanced written notice where the 1998 Leases required ninety. *Id*. The 1998 Leases also required that any notice "[s]hall be by certified mail, return receipt requested." *Id*.

Both versions made the leases assignable and binding on future heirs, using slightly varied language. *Id*. The 1983 Leases provided the leases "shall inure to the benefit of and be binding upon the parties hereto and to their respective tenants, heirs, successors, personal representatives, executors, administrators, and assigns," while the 1998 Leases stated "[t]his lease is assignable by Lessor or Lessee and shall be binding upon the heirs, successors and assigns of both Lessor and Lessee . . . ." *Id*.

Both versions anticipated that a variety of circumstances might arise to interfere with the billboards. If such a condition occurred, the lease gave Outlook the power to either terminate the

lease with fifteen-days' notice or abate rent payments. *Id*. Should Outfront elect to either terminate

or abate, the Powells were required to refund any advance payments for the relevant period. *Id*.

The 1983 Leases[6] broadly outlined various triggering-conditions:

> If at any time the highway view of the [billboards] is obstructed or obscured, or the advertising value of the displays is impaired or diminished, or the use or installation of such displays is prevented or restricted by law or by the Lessee's inability to obtain any necessary permits or licenses, or if the Lessee is unable, for any period of ninety (90) consecutive days or more, to secure and maintain a suitable advertising contract for the displays, or if there occurs a diversion of traffic from, or a change in the direction of traffic on highways leading past the Lessee's displays.

*Id*. The option to abate rent payment, rather than terminate the lease, follows, providing:

> If any of the [those conditions] shall at any time temporarily exist, then the Lessee may, at its option, instead of terminating this lease, be entitled to an abatement of rent payable here under during the period such conditions or any of them exist. . . .

*Id.*

Finally, both versions deemed the billboards trade fixtures, owned by Outfront. The 1983

Leases stated:

> All structures, displays and materials placed upon the said property by the Lessee are Lessee's trade fixtures and equipment, and shall be and remain the Lessee's property, and may be removed by the Lessee at any time prior to or within a reasonable time after the termination of this lease or any extension thereof.

*Id*. The 1998 Leases, went one step further:

> Leesee's display(s) shall not be considered abandoned at any time and shall not become the property of Lessor except by express conveyance in writing.

*Id*. (also including trade fixture and lessee ownership terms). LeMaster does not dispute that the

billboards here are the subject of these leases. She does not contest contract formation. She does

---

[6] The 1998 Leases contain substantially similar abatement provisions using different language. For example, the 1998 Leases include the triggering condition should the "Lessee's signs become entirely or partially obscured or destroyed."

not allege either party affirmatively terminated the contract with the advance written notice required by the leases. The correspondence indicates lease compliance in the early 2000s. *See* DE 100-6, 7, 8, 10 & 11. LeMaster focuses her efforts on proving that Outfront abandoned the leases. She does not allege, at least not in this motion, that either party affirmatively and expressly breached the leases, and, in this way, focuses on convincing the Court it should not enforce the leases. To make her case that the leases no longer control ownership, LeMaster essentially argues the leases were constructively terminated by Outfront's conduct or by reasons of public policy.

*Termination by Abandonment*

LeMaster's argues various iterations of a single position: Outfront abandoned the billboards, and thus, the leases ended or otherwise should not be enforced. LeMaster contends that Outfront fatally abandoned the billboards by allowing them to reach a state of complete dilapidation, failing to communicate with the lessor, failing to remedy prolonged periods of abatement and failing to acquire billboard permits.[7]

Kentucky recognizes abandonment across various areas of law, including, as relevant here, property, contracts,[8] landlord-tenant law,[9] and in the specific context of land leases for oil and gas

---

[7] In her Reply, LeMaster also argues, for the first time, that the dilapidated billboards "created a legitimate risk of harm," which voided the contract. DE 126 at 3. "Arguments raised only in reply, and not in the original pleadings, are not properly raised before the district court[.]" *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co*., 598 F.3d 257, 275 (6th Cir. 2010). The Court ignores (but also is not convinced by) the theory.

[8] *See Scheck Mech. Corp. v. Borden, Inc*., 186 F. Supp. 2d 724, 735 (W.D. Ky. 2001) ("Abandonment is an appropriate remedy 'if the original plan for the work had been so entirely abandoned, that the contract could not be traced and applied to any particular part of the work performed . . . .") (citing *L.K. Comstock & Co., Inc. v. Becon Const. Co., Inc*., 932 F. Supp. 906, 933 (E.D. Ky. 1993)).

[9] *See Jordon v. Nickell*, 253 S.W.2d 237, 238 (Ky. 1952) ("[F]ollowing an abandonment [of leased premises] by a tenant, the landlord is under no obligation to attempt to re-let the leased premises" and "is entitled to recover rental payments . . . as they become due[.]").

development.[10] While contract abandonment and lease abandonment each consider the effect of abandonment on the validity of an underlying obligation, property abandonment considers impact on ownership. While, as later discussed, LeMaster argues that Outfront wrongfully abated payment because the conditions were not "temporary," and that Outfront failed to manage the billboards in a commercially reasonable way in violation of an implied lease covenant, the crux of LeMaster's argument, especially as clarified in her Response, *see* DE 121 at 5, is that Outfront's abandonment terminated billboard ownership.

Abandonment of personal property is the voluntary relinquishment of a right or of property with the intention of repudiating ownership, meaning, not reclaiming it or reassuming its ownership or enjoyment. *Kelley v. Nationwide Auto Restoration, LLC*, 246 S.W.3d 470, 473 (Ky. Ct. App. 2007) (citing *Ellis v. Brown*, 177 F.2d 677, 679 (6th Cir. 1949)). "The intent to repudiate ownership may be inferred when the facts justify it, and the lapse of a long period of time following relinquishment of possession constitutes significant evidence of the intention to abandon property." *Id*; *see also Greer v. Arroz*, 330 S.W.3d 763, 765 (Ky. Ct. App. 2011).

Rather than property abandonment precedent, LeMaster turns to Kentucky regulations for authority that Outfront's conduct demonstrates billboard abandonment. The problem with LeMaster's reliance is that the relevant regulations do not purport to affect or terminate billboard ownership rights. For example, LeMaster points to the definition of "abandoned" in the Kentucky billboard scheme, as evidence of Outfront's abandonment:

---

[10] *See Am. Wholesale Corp. v. F. & S. Oil & Gas Co.*, 46 S.W.2d 498, 501 (1932) ("[C]ourts generally consider three distinct situations when discussing [oil and gas lease] "abandonment." First, where the lease is wholly unexecuted and has expired by its own terms; second, where the lessee commits some positive act showing his intention to abandon the lease; and, third, where the element of intention to give up the leased property is lacking, but the lessee for a longer or shorter period of time fails to carry on the work imposed upon him by the expressed or implied covenants of the lease.).

Section 1. Definitions. (1) "Abandoned" or "discontinued" means that for a period of one (1) year or more an advertising device has:
(a) Not displayed advertising matter;
(b) Displayed obsolete advertising matter;
(c) Needed substantial repairs due to lack of maintenance; or
(d) Only advertised for the sale, rent, or lease of the advertising device.

DE 101 at 4. This definition is regulatory, not part of Kentucky lease law.

Whether the at-issue billboards met that definition would be relevant only if some provision of the regulation mandated that abandoned billboards be torn down or that ownership of such billboards revert back to the lessor. None does. Failure to comply with the statute results in permit forfeiture, fines, and possible legal action. *See, e.g.*, 603 KAR 10:10 § 9 (addressing violations of the regulation and penalties, stating that the department will notify owners of advertising devices that violate the regulation or the implementing statute and outlining the administrative appeal process).

The billboards, here, did not require a permit, because the regulation is not retroactive and carves out a permitting exception for older, non-conforming billboards. *See* 603 KAR 10:10 § 4(1)-(9). The regulations do appear to require that grandfathered billboard owners "submit biennial updates." *Id.* at § 4 (2)-(5). Neither party addresses the record's silence as to these updates, although KYTC did not reflect Outfront's ownership status. Again, though, permit status could matter to the state, such status does not address title among private parties.

Even if KYTC deemed the billboards abandoned, this Court finds no law authorizing KYTC to terminate billboard ownership pursuant to a lease as a consequence of non-compliance or to permit non-owners to tear down non-complying billboards. LeMaster cites to nothing creating a nexus between regulatory conformity and lease efficacy.

LeMaster argues Outfront abandoned the leases by abating payment for such a duration contrary to the provision allowing abatement when certain conditions "temporarily exist." DE 121 at 4. The vegetation overgrowth lasted for so long, LeMaster's argument goes, that the condition was not temporary, the abatement rights expired, and failure to pay rent terminated the leases. This argument fails.

A lease, of course, is simply a variety of contract. The Court must follow the language of the lease, giving the terms their ordinary meaning and following the plain text, absent an ambiguity. *N. Star Co. v. Howard*, 341 S.W.2d 251, 255 (Ky. 1960) ("When the intention of the parties can reasonably be ascertained from the language used in the lease as a whole it is the duty of the court to effectuate such intention even though their purpose was inarticulately expressed."). The Court may not add or subtract terms but rather must honor the terms the parties saw fit to include. *Ralston v. Thacker*, 932 S.W.2d 384, 387 (Ky. Ct. App. 1996) ("The law applicable to oil and gas leases is that applicable to land . . . Of course, the parties may insert into a lease any provision desired.") (citations omitted).

The clear intent of the abatement provision is to maximize Outfront's options in the face of the enumerated conditions, including should the billboard become "entirely or partially obscured." DE 100-5. At that time, and in Outfront's discretion, the leases allow Outfront to terminate the lease or abate payments, which it might choose to do when such unfavorable conditions have the potential to reverse. The leases gave Outfront great discretion when it came to payment abatement.[11]

---

[11] The Court rejects speculation over the visibility issue from 2002 to 2016. The only record evidence from that period is Outfront's, and that evidence obviously establishes that the billboard sites were not visible from the Interstate. DE 100-13 (Watkins Depo.) at 20-21; DE 100-6 (2/8/01

The contracts broadly authorized abatement. Further, nothing in the leases suggests that prolonged abatement resulted in automatic termination. The Powells were not helpless, as the lessor retained termination rights.

*Impossibility*

The Court also rejects LeMaster's argument that "the right to terminate the lease as provided under its terms was meaningless to the Powells," because the Powells could not "provide written notice of termination about a lease of which they had no knowledge, to a lessee whom they could not locate." DE 121 at 4. As evidence that the Powells could not effectuate their termination rights, LeMaster states that Randy Powell once called the number listed on one of the billboards "to find out if there was an owner of the billboards who might assist with their unattractive appearance." DE 121 at 4 (citing DE 100-24 at 12-14).[12] The billboard displayed the name and phone number of Outfront-predecessor Viacom, DE 120-1 at ¶ 9, but Randy found the listed number disconnected. Here, LeMaster invokes the principle of impossibility, though she fails to provide any authority for her position. Essentially, she argues the leases should not be enforced, because the Powells could not exercise their termination rights. The record simply does not support this argument.

Contract theories of frustration and impossibility—which excuse performance due to "nearly total destruction of the purpose for which, in the contemplation of both parties, the transaction was entered into"—apply to lease contracts, but are "limited to those cases where the

---

Letter); DE 100-7 (5/30/01 Letter); DE 100-8 (7/2/01 Letter). LeMaster's photos from a side road at the time of billboard removal are not competent proof of the condition during the abatement period. *See* DE 101-14 (Photos).

[12] The Court finds no evidence Randy called hoping to reach an "owner of the billboards who might assist with their unattractive appearance." *See* DE 121 at 4; *but see* DE 100-24 (Randy Powell Depo.) at 12-14; *and see* DE 100-12 (Brenda Powell Depos.) at 68 (asserting Randy called the number to inform Viacom that Blanche Powell had died).

law or . . . regulations . . . have made illegal or prohibited absolutely the conducting of the [lease.]" *Frazier v. Collins*, 187 S.W.2d 816, 818 (1945). "[I]mpossibilities arising from the inability of the promisor to perform an act do not discharge the duty created by the contract[.]" *Raisor v. Jackson*, 225 S.W.2d 657, 659 (1949) (noting the "vital distinction" between "'the thing cannot be done' (impossibility) and 'I cannot do it' (breach)).

The Court makes several points. First, two leases were recorded, and all leases ran with the land relative to the legal heirs. *See* DE 100-5 (Leases) (each lease provides the easements were to run with the land and bind heirs); *see also Holladay v. Peabody Coal Co*., 560 S.W.2d 550, 556 (Ky. 1977) (upholding restrictive real estate covenants where parties' clearly intended that easements would bind heirs, even where a specific term was not defined); *see Fortner v. Gulf Ref. Co*., 316 S.W.2d 65, 68 (Ky. 1958) (considering, and rejecting, the argument that a covenant must specifically state the restriction was to "run to the heirs or assigns of the covenantee," and finding it sufficient to bind heirs that the easements "constitute rights which run with the land") (citing *Westgate Vill. Shopping Ctr. v. Lion Dry Goods Co*., 21 F.3d 429 (6th Cir. 1994)). Second, the heirs knew there had been leases in abatement since 2002. *See* DE 100-12 (Brenda Powell Depo.) at 17; *see also* DE 100-24 (Randy Powell Depo.) at 29. Third, the leases expressly bound the heirs. DE 100-5. Finally, the lease required that the lessor give notice of any ownership change. DE 100-5. Thus, when Blanche Powell died and the case went through probate, the lessor should have notified the lessee of the change. Had the landowner followed the lease steps, there would have been no impediment to a rights exercise. This is hardly a situation of impossibility.

### *Implied Covenants*

LeMaster analogizes to oil and mineral leases to argue the Court should find that Outfront's failure to secure billboard advertisement (and, instead, election to abate rent payments) provides

another ground for non-enforcement. Essentially, LeMaster asks the Court to read into the leases an implied covenant to secure advertisement as well as a term limiting the abatement period.

True, courts have read an implied duty to develop minerals in oil and gas leases, and failure to do so—also often referred to as abandonment—grounds for nonenforcement. "Generally, all leases of land for the exploration and development of minerals are executed by the lessor in the hope and upon the condition, either express or implied, that the land shall be developed for minerals; and it would be unjust and unreasonable, and contravene the nature and spirit of the lease, to allow the lessee to continue to hold under it any considerable length of time without making any effort at all to develop it according to the express or implied purpose of the lease." *Soaper v. King*, 180 S.W. 46, 48 (1915) (collecting cases establishing oil and gas lessees "were bound to diligently work . . . to bring the product to a present market, and . . . promptly yield to the lessor his royalty, and that, unless the lessees did so actually develop the land in question, and in good faith and diligence operate it, the lease should be deemed abandoned."). Courts have also limited the duration of oil and gas leases to a reasonable amount of time. *Leeper v. Lemon G. Neely Co.*, 293 F. 967, 970 (6th Cir. 1923) (announcing the "Kentucky rule . . . which imports into every oil lease . . . a condition that it shall continue for only a reasonable time"). One court aptly explained that the landlord tenant theory of abandonment is "often erroneously" applied in oil and gas lease cases:

> "In the case of a true abandonment, the lessee's title is gone the minute he determines to give up the property and does some act in pursuance of that intention. In cases of the class [of oil and gas leases] under consideration, however, the intention to give up the property is absent. There is, of course, no act done in pursuance of such an intention. The lessee's intention is to keep the lease, but to postpone the work of exploration, development or operation to a time which suits his convenience. To declare the lease at an end, against the lessee's express intention, because of such postponement, is to put upon him an obligation to explore, to

develop or to operate, as the case may be. **His title is terminated, not by his intention, but because of his failure to comply with the obligation imposed by the law. It is therefore, lost by failure to comply with the implied covenants of the lease, and not by abandonment.** Abandonment is an intentional and voluntary relinquishment; an enforced and involuntary giving up of rights under the lease must be a forfeiture for breach of the obligations imposed by the implied covenants. The weight of authority recognizes this important and fundamental distinction."

*Am. Wholesale Corp.*, 46 S.W.2d at 501 (quoting Maurice H. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases* 20 (1926) (emphasis added)).

Because oil and gas leases were often drafted to last indefinitely—without any lessor termination mechanism—the landowner was prevented from leasing its land to another developer, even where a lessee had no intention of returning and developing the land. *See e.g.*, *Soaper*, 180 S.W. at 47 (invoking abandonment theory to declare invalid and cancel a lease under which "it was optional with the lessees when, if ever, operations under the lease should be carried to a stage that would yield a royalty to the lessors . . . and if the contract was a valid one, the lessors had no relief whatever"). Courts took issue with the unilateral nature of these contracts:

"Such contracts lack the mutuality essential to their validity. A unilateral executory contract is in law a nudum pactum, and is unenforceable. Where it is left to one of the parties to an agreement to choose whether he will proceed or abandon it, neither can specifically enforce its execution in equity."

*Soaper*, 180 S.W. at 47 (quoting *Berry v. Frisbie*, 86 S. W. 558, 559 (1905)). Courts found that the clear intent of the parties entering the contract—"the point where their minds met"—included an implied covenant to develop the land. Notably absent from oil and gas leases courts found terminated by abandonment were any provisions for periods of nondevelopment. *See Am. Wholesale Corp.*, 46 S.W.2d at 500-01 ("In the absence of a provision in the leases authorizing the owners thereof to shut down pumping and to cease marketing the products therefrom for an

unreasonable period of time, without the consent of the lessors, such action constitutes . . . a clear breach of the implied covenants[.]"). However, courts routinely upheld oil and gas leases that expressly contemplated nondevelopment. *See, e.g.*, *Monarch Oil, Gas & Coal Co. v. Richardson*, 99 S.W. 668 (Ky. 1907).

LeMaster attempts to equate the billboard leases with this line of oil and gas case law. *See* DE 101 at 13. However, not only is the Court unaware of any Kentucky authority to impute an implied covenant to develop or operate the billboards, but the leases, here, provided a termination mechanism available to both parties. This distinction alone dooms LeMaster's analogy. LeMaster contents that "[t]he perpetual renewal of the leases without rent would be unconscionable and in violation of public policy," DE 121 at 3, but she undoes herself on the same page—"[d]uring [the periods of abatement], the Powells had every right to terminate the leases. The leases' terms permit termination by either party upon simple written notice[,]" *id.* Under the 1983 leases, Blanche Powell would have enjoyed a yearly termination right as early as 2003, just after abatement. The 1998 initial ten-year term ended in 2008, when Blanche Powell still was living, and she had a termination right then. The leases did not continue "in perpetuity" the way the oil and gas precedent contemplates.[13] The temporal limits and termination rights distinguish these leases from the oil & gas context cited by LeMaster.

Further, the leases resist implied terms. The 1998 versions expressly require that any lease modification be "in writing signed by the parties[.]" The 1983 versions protect against enforcement

---

[13] Further, forfeiture via breach of an implied covenant requires notice and a demand to the lessee. *See Northup Properties, Inc. v. Chesapeake Appalachia, L.L.C.*, 07-CV-30-ART, 2008 WL 818995, at *4 (E.D. Ky. Mar. 25, 2008) ("In order to cancel a lease in this manner, however, notice and demand to develop the lease must occur first[.]"), *aff'd*, 567 F.3d 767 (6th Cir. 2009). The Powells (neither Blanche nor her heirs) made no such demand on Outfront.

of "any agreement or representation, expressed or implied, not contained herein." Finally, the lessors at no time complained about the abatement decision or otherwise claimed a right to continuing rent. This is not a situation where a mineral lessee is limiting, by unilateral decision, the economic productivity of land; rather, the lessor and lessee here agreed to a series of abating circumstances in temporally circumscribed leases. The lessee could have ended both arrangements by as early as 2003 and 2008. The Court rejects the predicate argument for an implied abatement limit.

*Termination by Public Policy*

LeMaster argues that "[t]o allow the leases to continue to have validity after the signs are abandoned and dilapidated would allow enforcement of a contract that is against the public policy of the Billboard Act." DE 101 at 12. Courts may void contracts that violate law or public policy, including policy announced in administrative rules, "where the contract has a direct objective or purpose that violates the federal or state Constitution, a statute, an ordinance, or the common law" and "its enforcement is clearly outweighed in the circumstances by a public policy. . . ." *Martello v. Santana*, 713 F.3d 309, 313 (6th Cir. 2013) (quoting Y*eager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005); Restatement (Second) of Contracts § 178 (1981)); *see also Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 438 (6th Cir. 2008).

The Court does not accept that enforcing the leases concerning these billboards runs contrary to the law or public policy announced in Kentucky billboard regulations. The regulatory scheme is designed to incentivize the removal of old, dilapidated, even *illegal* billboards by handing out credits to build electronic billboards. 603 KAR 10:021 §2(3). Thus, the regulations, themselves, contemplate that entities like LeMaster and Outfront continue to own old, nonconforming or illegal billboards. *See, e.g.*, DE 100-17 at 15-16. The fact that KYTC first

required proof of ownership before awarding credit for these very billboards indicates the regulatory expectancy that billboards existing in exactly the state of disrepair as these are still subject to valid ownership interests. LeMaster cannot summon contract termination from such a policy.

*Conclusion on Abandonment*

Here is the bottom line: the Court refuses to find abandonment where the record shows lease compliance by Outfront. The lessee abated rent, as supported by the empirical status and all lease terms; the lessor did not object and did not take steps to terminate, of right, at lease anniversary dates. In 2016, the Powell heirs owned land subject to the leases; the leases either were public record or were known to the heirs from the early 2000s. Had Blanche Powell's executrix adhered to lease-notice rules, Outfront would have had a direct communication link to the heirs. Outfront continued to evaluate the leases through the years, variously inspecting, contemplating removal, and assessing the status of the billboards. Abandonment requires relinquishment and intentional surrender of lease rights. That simply never happened, and the record conclusively forecloses abandonment as a theory of benefit to LeMaster in this dispute.

 *ii.*  *Intention to Interfere and Legal Cause of Loss*

Outfront's conversion claim requires that LeMaster "intended to interfere" with Outfront's billboards. "However, the intent required is merely 'the intent to exercise control over the property.' It is irrelevant whether [LeMaster] acted in good faith believing [she] had the right to control the property as 'wrongful intent is not an essential element' of the tort of conversion." *Jasper*, 492 S.W.3d at 582 (quoting 13 David J. Leibson, *Kentucky Practice—Tort Law* § 8.2 (2015 ed.)). The transfer of ownership form LeMaster executed with the Powells controls. No reasonable juror could find LeMaster did not intend to take ownership of the billboards through

that instrument. Of course, LeMaster incontestably destroyed the billboards per her agreement with the Powells.

Outfront must also prove LeMaster's act was the legal cause of loss. Kentucky law employs the substantial factor test to determine causation. LeMaster's conduct was a substantial factor if it had "such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Jasper*, 492 S.W.3d at 583 (quoting *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 91–92 (Ky. 2003)). This element is not reasonably in dispute.

### iii. Remaining Elements

Outfront handily establishes the remaining conversion elements.[14] LeMaster denied Outfront the ability to exchange the billboards for state credit to her own use and beneficial enjoyment of the property. In its 2016 letter to LeMaster, Outfront demanded LeMaster turn over the credits, the effective value of the converted property, and LeMaster refused. DE 100-20. Accordingly, the Court grants summary judgment for Outlook on its conversion claim.

### B. Bona Fide Purchaser Defense

The parties dispute in part what occurred around the Powell-LeMaster transfer of ownership. Still, LeMaster's bona fide purchaser defense fails as a matter of law. LeMaster argues that she was an innocent third-party purchaser. Fatally, good faith is immaterial to conversion, even as to an innocent purchaser of converted property.[15] *Baciomiculo, LLC v. Nick Bohanon*,

---

[14] The Court rejects any reliance on *Boling v. Prospect Funding Holdings, LLC*, 324 F. Supp. 3d 887, 892 (W.D. Ky. 2018). *See* DE 121 (LeMaster Response) at 7. Outfront does not assert a contract claim against LeMaster; indeed, it has no contract with LeMaster. *Boling*, which regulates remedies when a party combines contract and conversion theories, has no impact on Outfront's pursuit of its conversion theory. *See Boling*, 324 F. Supp. 3d at 898 (holding that defendant could not recover both for conversion claims and equitable contract claims as he "failed to show that he sustained tort damages or a loss independent of the contract damages").

[15] There are many other potential issues here, especially given that LeMaster proceeded without any pre-purchase effort to address title through, *e.g.*, a records search. In the Commonwealth, a

*LLC*, 498 S.W.3d 790, 793 (Ky. Ct. App. 2016) (reversing and holding that a purchaser's good faith is irrelevant when the seller did not have title to the property and had not acquired title by virtue of true owner's abandonment, even despite seller's ownership representations); *State Auto. Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. Ct. App. 1990). As Outfront notes, *Baciomiculo*, settles the matter. In *Baciomiculo*,[16] the court agreed with the plaintiff that the lower court's judgment was a "backward application of the law; and that the general rule . . . is

---

[15] land purchaser may claim protection against prior real estate encumbrances if she buys "the land for [1] a valuable consideration and [2] without notice" of the existing encumbrance. *Givens v. Turner*, 113 S.W.2d 1166, 1169 (Ky. 1938); *Glass v. Gutman*, 268 S.W.2d 410, 412 (Ky. 1954) ("It is a well-known rule of law that a bona fide purchaser of land without notice of an equity in favor of a third person is not affected thereby."); *see also Young v. Adams*, 267 S.W.2d 85, 86 (Ky. 1954) ("[T]he only question material to our determination of the appeal is whether or not appellant was a bona fide purchaser without notice of the unrecorded conveyance."). However, a buyer with actual or constructive notice, *i.e.*, "knowledge of such facts as would put her on inquiry[,]" of a superior claim is robbed of any innocent purchaser status. *Young*, 267 S.W. 2d at 87; *cf. Floyd Cty. Bd. of Ed. v. Johnson*, 260 S.W.2d 217, 218 (Ky. 1953) ("A recital in an instrument of conveyance in a chain of title is sufficient to put a purchaser upon notice of outstanding equities so as to preclude him from claiming protection if its terms ought to put him on inquiry."). Further, whether a purchaser "is to be treated as taking a mere speculative chance in the property, or a clear title, must depend upon the character of the title of the grantor when he made the conveyance; and the opportunities afforded the grantee of ascertaining this fact, and the diligence with which he has prosecuted them, will, besides the payment of a reasonable consideration, determine the bona fide nature of the transaction on his part." *Hosman v. Willett*, 107 S.W. 334, 336 (Ky. 1908); *see also Farmer v. R.C. Tway Coal Co.*, 264 S.W. 743, 744 (Ky. 1924) ("possession of land by a third person is sufficient to put a subsequent purchaser on inquiry, and charge him with notice of everything that ordinary diligence in pursuing the inquiry would disclose."). At least two of the leases here are recorded, and a diligent deed search would have yielded the operative documents. "[C]onstructive notice is established by mere proof that a valid interest in real property is properly recorded in the office of a county court clerk." *State St. Bank & Tr. Co. of Bos. v. Heck's, Inc.*, 963 S.W.2d 626, 630 (Ky. 1998) (citation omitted). LeMaster admits that she made no pre-purchase trip to the Rockcastle Clerk's Office. Accordingly, for multiple reasons, LeMaster cannot claim bona fide purchaser protection.

[16] In *Baciomiculo*, the defendants did not claim the disputed property had been abandoned, as LeMaster does here. However, the Court has already determined the billboards were not abandoned trade fixtures, because the leases were never terminated. Additionally, several of the leases contain anti-abandonment clauses, which provide that, even upon lease termination, the billboards remained Outfront's property and would not be considered abandoned "except by express conveyance in writing."

that a buyer's good faith is irrelevant if the seller lacks title." Therefore, and given the Court's lease analysis, LeMaster's bona fide purchaser defense fails.

### C. Outfront's Tortious Interference with Contract Claim

In addition to its conversion claim, Outfront seeks summary judgment on its tortious interference claim. Kentucky follows the Restatement (Second) of Torts. *See Carmichael–Lynn–Nolan Adver. Agency, Inc. et al., v. Bennett & Assoc., Inc.*, 561 S.W.2d 99 (Ky. Ct. App. 1978); *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 620 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011). The Restatement (Second) of Torts § 766 provides the claim for interference with an *existing* contract:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979). "Tortious interference liability 'is predicated upon an intentional interference, malicious or without justification with known contractual rights possessed by the party suing to recover damages thereof.'" *Ventas*, 635 F. Supp. 2d at 620 (quoting *Carmichael*, 561 S.W.2d at 102).

"In essence, to recover under this specific theory, [Outfront] must prove the following elements: (1) the existence of a contract; (2) [LeMaster's] knowledge of this contract; (3) that [LeMaster] intended to cause its breach; (4) [LeMaster's] conduct caused the breach; (5) this breach resulted in damages to [Outfront]; and (6) [LeMaster] had no privilege or justification to excuse [her] conduct." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995). The Court finds no question as to the satisfaction of the first and fourth elements. The leases were operative and LeMaster's efforts to effect ownership transfer caused their breach. However, the

Court need not consider each remaining element, as its analysis begins and ends with the knowledge prong of the tortious interference test.[17]

Outfront makes a passing reference to actual knowledge, but its argument really is one of "constructive" notice to LeMaster. *See* DE 100, at 18 (referencing clerk's office records and LeMaster's prior billboard experience—"LeMaster should have known about the Leases at issue"). Brenda Powell testified that she talked about abated leases, but she (and Randy Powell) repeatedly testified that they viewed and considered the leases no longer valid or in force. *See* DE 100-12, at 39 (denying being bound), 49 (denying "active" leases), 52 (same); DE 100-25 at 11 (denying leases in effect); 28 (leases "were not valid"); 38 (equating fact of abatement with no longer being valid). The Court finds it unreasonable, as a matter of law, to treat LeMaster as having actual knowledge of effective leases that the property owners themselves considered, in the historical context, kaput. The landowners testified that they would not have proceeded if they had thought the leases effective. Given that, and the lack of any other actual knowledge as to these tracts, the Court finds no reasonable basis for a finding that LeMaster *knew* the contracts existed.

The Kentucky tort, built on Restatement (Second) § 766, is one for *intentional* interference with contract. Outfront cites a mortgage case on the concept of inquiry notice, but that is far from the intentional tort context. As the Restatement says:

> To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is

---

[17] Moreover, the Court need not consider arguments a party did not raise. LeMaster limited her argument as to the tortious interference claim, only advancing (1) that no contract existed, *see* DE 101 at 20, and (2) that she lacked the requisite actual knowledge of the contract, DE 126 at 11. She did not protest the intent element. Outfront merely alleged that LeMaster intended to interfere. The controlling standard, however, "is predicated upon an intentional interference, malicious or without justification." *See Ventas*, 635 F. Supp. 2d at 621. Consequently, and because the knowledge element is determinative, the Court declines to decide whether Outfront satisfied the intent element.

> interfering and of the fact that he is interfering with the performance
> of the contract.

Restatement (Second) of Torts § 766 cmt. i (Am. Law Inst. 1977). Liability attaches to "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract[.]" *See Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC,* 182 S.W.3d 529, 533–34 (Ky. Ct. App. 2005).

Outfront correctly identifies a paucity of Kentucky precedent expanding on the knowledge element of a tortious interference claim, but, the authority that does exist suggests actual knowledge. *See Johnson v. Nationstar Mortg., LLC*, No. 4:17-CV-00074-JHM, 2017 WL 3401303, at *2 (W.D. Ky. Aug. 8, 2017) ("Kentucky case law establishes that '[t]ortious interference liability "is predicated upon an intentional interference,"' rather than one grounded in negligence.") (quoting *Ventas*, 635 F. Supp. 2d at 621; *Carmichael*, 561 S.W.2d at 102; *see also Byers v. Toyota Motor Mfg., Ky. Inc*., 172 F.3d 47, *2 (6th Cir. 1999) (Table) ("as a general rule, tortious interference with contractual relations requires an intentional interference and . . . generally there is no liability for a negligent interference with a contract") (collecting Kentucky law).

Moreover, in *Crown Equipment Corp. v. Toyota Material Handling, U.S.A., Inc*., the Sixth Circuit agreed that requiring a plaintiff to show only that a defendant "knew or should have known of the [contract] wrongly imports a negligence standard into the analysis," and, that "even if [the defendant] were negligent in not investigating the contract details, it cannot be liable for *intentionally interfering* with that contract." 202 F. App'x 108, 112 (6th Cir. 2006). While the court was construing Ohio law, Ohio, like Kentucky, has adopted the Restatement (Second) of Torts

§ 766, and, like Ohio, Kentucky law does not recognize the tort of negligent interference with a contractual relationship. *Nationstar*, 2017 WL 3401303 at *2.

LeMaster may have had reason to doubt the situation, but the Court does not see a triable issue on her actual knowledge of a binding contract between Outfront and the Powell heirs. Because the Court is not convinced that a constructive notice, essentially negligence-type theory, supports the intentional tort, the Court rejects the intentional interference claim. Outfront has the right to the billboards, but LeMaster (though proceeding without due diligence) did not intentionally interfere with Outfront's known rights.

### D. LeMaster's Interference Counterlaim

LeMaster cannot sustain a tortious interference with prospective economic advantage claim based on interference with her use and enjoyment of converted property. The claim for interference with a *prospective* economic advantage is conceptually similar to a claim for interference with an *existing* contract. Kentucky adopted Restatement (Second) of Torts § 766B for claims of tortious interference with prospective contractual relations in *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine College v. Hornung*. 754 S.W.2d 855, 857 (Ky. 1988). *See Mountain Motorsports Paving & Const. LLC v. Yamaha Motor Corp., U.S.A.*, No. 14-CV-76-ART, 2014 WL 5341865, at *6 (E.D. Ky. Oct. 20, 2014). "[*Hornung*] held that Sections 766B, 767 and 773 of the Restatement (Second) of Torts reflect the prevailing law in Kentucky." *Turner v. Kentucky River Cmty. Care*, No. 2016-CA-001186-MR, 2018 WL 385548, at *2 (Ky. Ct. App. Jan. 12, 2018). "In an action for tortious interference with prospective economic advantage, [LeMaster] must show facts that support the claim that [Outfront] (1) intentionally and improperly interfered with (2) another's prospective contractual relation by (3) either inducing a third person not to enter or discontinue the prospective relation or by preventing the other from continuing the prospective

relation and (4) causing pecuniary harm resulting from the loss of the benefits of the relation. *Id.* (quoting Restatement (Second) of Torts § 766B). To prevail under this theory of liability, the "party seeking recovery must show malice or some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859.

LeMaster's counterclaim logically fails, given the Court's analysis in this Opinion. To make the interference claim (essentially, that Outfront's assertion of rights itself was wrongful), LeMaster would have to prevail on the underlying merits. Because the Court finds the leases effective and Outfront the billboard owner, that predicate does not exist.[18]

## IV. REMEDY

The result of this Opinion, and the Court's conversion calculus, is a finding that Outfront owned the billboards when LeMaster destroyed them in 2016. As such, between Outfront and LeMaster, Outfront is entitled to the electronic credits resulting from destruction of the Powell billboards. The KYTC is a party, and the Court directs the KYTC to effectuate this decision.

Outfront's claim to other damages must be resolved by a jury. A conversion claim may include consequential damages, when properly proven. *See Motors Ins. Corp. v. Singleton*, 677 S.W.2d 309, 314 (Ky. Ct. App. 1984) (in a conversion action to recover consequential and incidental damages in addition to the fair market value of the converted chattel.) ; *see also Holley Performance Prod., Inc. v. Smith-CNC China Network Co.*, 06-CV-165-JHM, 2009 WL 1067307,

---

[18] Alternatively, the Court agrees that LeMaster's construction of a case on Outfront's legitimate assertion of rights is faulty. The judicial statements privilege "affords an absolute privilege to statements made preliminary to a judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding and that have some relation to a proceeding that is contemplated in good faith and under serious consideration." *Halle v. Banner Industries of N.E., Inc.*, 453 S.W.3d 179, 184 (Ky. Ct. App. 2012). This well-describes Outfront's pre-suit machinations protective of the credits. *See* DE 100-19 (Open Records Request & E-Mail to KYTC); 100-20 (Demand Letter).

at *8 (W.D. Ky. Apr. 21, 2009) (same). The parties have not briefed that issue. In any event, here, the Court finds Outfront's damage proof far too speculative to warrant a summary decision. The proof it cites, including its other billboard experience and predictive revenue for an electronic billboard it "expects it would have been able to obtain," DE 100-25, at 1, is indeterminate. To recover delay damages, Outfront must, through competent and undisputed proof, eliminate factual questions about permit issuance, lease timing, and likely terms. Perhaps it can do this before a jury, but the conclusory and conditional proof in the record now forecloses a motion-based finding. Further, Outfront's own conduct, to include its lack of attention to the billboards and its intentions as of 2017, may impact a fact-finder's analysis of any losses consequential to the conversion.

## V.        CONCLUSION

For the foregoing reasons, and on the terms stated, the Court **GRANTS IN PART** DE 100, **GRANTS IN PART** DE 101, and **DENIES** DE 98[19] as moot. The Court will set a status conference in the case.

This 24th day of June, 2019.

**Signed By:**

_Robert E. Wier_

**United States District Judge**

---

[19] Because LeMaster has no remaining affirmative claim, the Court **DENIES** as moot DE 98, which targeted LeMaster's damages expert.